# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| JACOB KANE SNIDER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.   14-cv-1249 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

# O R D E R  &  O P I N I O N

This matter is before the Court on Plaintiff's Motion for Summary Judgment (Doc. 11) and Defendant's Motion for Summary Affirmance. (Doc. 15). For the reasons explained below, Plaintiff's motion is granted in part and denied in part and Defendant's motion is denied. Because the ALJ erred in assessing Plaintiff's claim for benefits, her decision is vacated and the matter is remanded to the Commissioner for further proceedings consistent with this opinion.

### PROCEDURAL HISTORY

On November 10, 2009, Plaintiff Jacob Kane Snider applied for disability insurance benefits under Title II of the Social Security Act, claiming that he had become disabled as of April 25, 2009 due to a back injury and burst fracture in his back. (R. at 167-173, 104).[1] The Social Security Administration initially denied his application on February 15, 2011. (R. at 100-104). Plaintiff filed for reconsideration on February 17, 2011 (R. at 105), and was again denied on April 22, 2011. (R. at

---

[1] Citation to R. at ___ refers to the page in the certified transcript of the entire record of proceedings provided by the Social Security Administration.

105-109). On June 21, 2011, Plaintiff requested a hearing before an ALJ. (R. at 110-111). An ALJ held a hearing on December 4, 2012, at which Plaintiff, represented by an attorney and his attorney's paralegal, appeared and testified. (R. at 49-97). Plaintiff's father, Jay Snider, and a vocational expert also testified. (*Id.*). On December 26, 2012, the ALJ issued a decision finding that Plaintiff was not disabled, and thus not eligible for disability insurance benefits. (R. at 19-31). The Social Security Administration received Plaintiff's request that the Appeals Council review the ALJ's decision on February 1, 2013 (R. at 15). The Appeals Council denied Plaintiff's request for review on April 17, 2014, thereby making the ALJ's decision the final decision of the Commissioner of Social Security. (R. at 1-7). Plaintiff then filed his Complaint (Doc. 1) with this Court on June 20, 2014.

## Background

### I. Relevant Medical and Other History

Plaintiff previously worked customizing sports utility vehicles. (R. at 53). While at work in April of 2009, he was test-driving one of the SUVs that he had customized, and drove it over a rise in the road, causing it to become airborne. (R. at 53-54). When it landed, he experienced a "sudden onset of weakness in his left leg and severe back pain." (R. at 343). Immediately after the accident, he lost strength in his left leg, but began regaining it three to four hours later. (*Id.*). As a result of the accident, Plaintiff suffered a burst fracture in his spine at the T12 vertebra. (R. at 341).

Since the accident in April of 2009, Plaintiff has not sought regular medical treatment. In fact, the record reflects that Plaintiff sought treatment at three

distinct times: (1) at the University of Iowa hospital in Iowa City just after his accident in 2009 (R. at 269-81; 339-71); (2) with Judy Wakeland, a nurse practitioner at OSF Holy Family in Monmouth, Illinois, from January 2012 through June 2012 (R. at 298-309); (3) and at Saint Mary Medical Center in Galesburg, Illinois in July 2012 following a fall. (R. at 310-338). Additionally, Plaintiff was examined by a consultative physician, Dr. Afiz A. Taio, on January 21, 2011. (R. at 282-86). The Court summarizes this medical history below.

Immediately following the accident, Plaintiff was transported to a local emergency room, where a CT scan revealed a T12 burst fracture. (R. at 341). He was subsequently transferred to the University of Iowa hospital in Iowa City. (*Id.*). Although Plaintiff lost strength in his left leg following the accident, records reflect that he maintained sensation in both legs. (R. at 343).[2] On arrival at the University of Iowa hospital, he was able to move his left leg with full strength. (*Id.*).

An MRI performed on April 25, 2009 revealed a T12 compression fracture with stable retropulsion into the spinal canal resulting in severe canal stenosis (or narrowing of the spinal canal). (R. at 365). The MRI showed vertebral body height loss at T12 as "stable" at twenty-five percent. (*Id.*).

On April 30, 2009, Plaintiff's "neurologic examination continued to be stable." (R. at 280). He had full strength in his arms and legs, and did not demonstrate any sensory deficits or neurological deficits. (R. at 281). Plaintiff was discharged with a camp brace, which his doctor advised him to wear when he was out of bed. (R. at

---

[2] Plaintiff's father reports that Plaintiff could not feel either of his lower extremities at the time of his accident, but that he regained sensation in his feet after the local emergency room where he was originally seen administered steroids and he arrived at the University of Iowa hospital. (R. at 394).

280-81). He was permitted to do activity "as tolerated, but instructed not to engage in real strenuous activity or heavy lifting." (R. at 281). His physician offered the possibility of surgery for pain control, but Plaintiff ultimately declined it in favor of more conservative treatment. (*See* R. at 280, 394).

Plaintiff returned to the hospital for a follow-up appointment on May 14, 2009. (R. at 274-75). There, he reported that he was taking cyclobenzaprine (a muscle relaxant) and oxycodone (an opioid painkiller). (R. at 274). His back pain had improved, but he had "some subjective weakness going down his left leg." (R. at 275). He exhibited strong muscle strength and sensation in his arms and legs, and walked with a guarded but stable gait. (*Id.*). Images of Plaintiff's back revealed that his spinal canal capacity was approximately fifty-three percent due to the burst fracture. (*Id.*). His doctors recommended that Plaintiff remain on his twenty pound lifting restriction until his next follow-up (three months later) and avoid ladders, scaffolding, or other areas where he might be likely to fall. (*Id.*).

Plaintiff's last follow-up with doctors at the University of Iowa was on August 27, 2009. (R. at 276-79). There, he "denied any weakness or bowel or bladder disturbances," but said he had "some tingling in his anterior thighs and back discomfort." (R. at 277). He had strength and sensation in his arms and legs, and had a stable gait. (*Id.*). Images of his back revealed mild angulation of the T12 fracture, which was stable in appearance. (R. at 278). His doctors advised him to "avoid heights or conditions that predispose him to falls until one year from his injury." (*Id.*). Although the notes reflect that Plaintiff should schedule a follow-up visit at the anniversary of his accident (*see id.*), there are no notes from any

subsequent visit. The record reflects that Plaintiff was not wearing his brace during this last follow-up visit. (*Id.*).

The Illinois Bureau of Disability Determination Services retained Dr. Afiz Taiwo to conduct a consultative exam of Plaintiff, which he performed on January 21, 2011. (R. at 282-85). Plaintiff presented to Dr. Taiwo with a chief complaint of lumbar spine pain. (R. at 282). He explained to Dr. Taiwo that following his April 2009 accident, he wore a brace for six months and that his left leg was paralyzed. (*Id.*).[3] At the time of the examination, he complained of constant, throbbing lower back pain that he rated as a five out of ten in intensity. The pain became more acute (a seven out of ten) when he coughed or sneezed and was aggravated by prolonged activities. (*Id.*). He told Dr. Taiwo that his pain radiates down his left leg, to the ankle, and that he experiences numbness and weakness in his left leg. (*Id.*).

Dr. Taiwo noted that Plaintiff was able to get on and off of the examination table with no difficulty, and could walk more than fifty feet with a non-antalgic gait and without support or the use of an assistive device. (R. at 284). However, he also noted that Plaintiff "alternated sitting and standing during the entire history taking due to back and left leg pain." (*Id.*). Other findings during the exam reflected limitations. Plaintiff performed toe/heel walk with difficulty on his left leg, had a limited range of motion in his lumbar spine (sixty degrees flexion with pain, ten degrees extension with pain, and right and left rotation with pain), a positive

_____

[3] The Court notes that this is inconsistent with the August 27, 2009 records from the University of Iowa hospital (four months after Plaintiff's accident), which noted that Plaintiff was not wearing his brace. (R. at 278).

straight leg raise test, and reduced leg strength. (*Id.*). Following the examination, Dr. Taiwo concluded that Plaintiff suffers from lumbar radiculopathy. (R. at 285).[4]

Plaintiff began seeing Judy A. Wakeland, a nurse practitioner in Monmouth Illinois, on January 16, 2012. (R. at 307). At his first visit, he explained that he had broken his back, was experiencing numbness in his legs (more so in his left than right), had dull back pain, and wanted to "see what [his] options" were. (*Id.*).

Ms. Wakeland's notes indicate that Plaintiff had a decreased range of motion, back pain, neck pain, and numbness. (*Id.*). Plaintiff described his pain as a three out of ten, and said that it is triggered by rising from a seated position, standing, and walking. (R. at 308). The record indicates that Ms. Wakeland saw Plaintiff four more times (February 3, March 2 and 3, and June 26), and Plaintiff's complaints of pain were consistent across the visits. (*See* R. at 298-304). During Plaintiff's February 3 visit, in which Plaintiff reported that he was "trying to get disability," Ms. Wakeland indicated that Plaintiff could do all of his activities of daily living without limitations. (R. at 304). Ms. Wakeland instructed Plaintiff to take Naprosyn (a nonsteroidal anti-inflammatory drug) and on June 26, 2012 prescribed skelaxin (a muscle relaxant). (R. at 299).

On July 2012, Plaintiff checked in to the emergency room at St. Mary Medical Center in Galesburg, Illinois. He explained that after he sneezed, he experienced transient weakness in his left leg, which caused him to fall. (R. at 317).

---

[4] Lumbar radiculopathy is "any disease of lumbar nerve roots, such as from disk herniation or compression by a tumor or bony spur, with lower back pain and often paresthesia." *Dorland's Medical Dictionary*, http://www.dorlands.com (last visited July 7, 2015).

When he tried to steady himself, he likely twisted his back. (*Id.*). At discharge, the emergency room doctor noted Plaintiff's chronic compression deformity at T12. He reported that Plaintiff had muscular tenderness on the left side of his back and weakness in his left leg (R. at 316), but "no new or worsening neurologic findings." (R. at 317). Because Plaintiff's exam was "chronically abnormal" with respect to spinal cord and nerve problems, he arranged for an outpatient MRI. (*Id.*).

The MRI was performed on July 23, 2012. (R. at 333). At that time, Plaintiff reported persistent back pain, bilateral leg pain, and instability that was worse with the left leg than right leg. (*Id.*). The MRI revealed "a chronic appearing compression fracture deformity at the level of T12" with "mild retropulsion of fracture fragments at this level." (*Id.*). There was a "small focus of high T2 signal intensity" in the spinal cord "immediately adjacent to the posterior superior endplate," which was "likely . . . an area of chronic myelomalacia." (*Id.*).[5] There was also a loss of "probably about 60 to 70% of vertebral body height anteriorly" at T12. (*Id.*).

The MRI also revealed a number of issues with Plaintiff's cervical spine. This included a prominent disc bulge at C6-7, and degenerative disc disease with associated disc bulges at C4-5, 5-6, and 6-7. (*Id.*). This resulted in "multilevel central spinal stenosis which is at least mild and more likely moderate in degree." (*Id.*). A doctor at OSF Holy Family in Monmouth prescribed Plaintiff a cane for walking on July 31, 2012. (R. at 398).

---

[5] Myelomalacia is the "morbid softening of the spinal cord." *Dorland's Medical Dictionary*, http://www.dorlands.com (last visited July 7, 2015).

## II. Hearing Testimony

At the hearing, Plaintiff and his father described to the ALJ a variety of ways in which Plaintiff's accident and the resulting back problems had affected his activities of daily living.

As Plaintiff explained, following his hospital stay in 2009, his condition began to improve even though he still experienced "functionality problems with [his] left leg and balance." (R. at 62). However, "it got to the point where it started downgrading, where the injury on the spinal cord started affecting [his] legs a little bit more on [his] balance . . . ." (*Id.*).

Plaintiff has not worked since his accident. (R. at 56-57). He testified that today he needs to use a cane, as he regularly loses his balance when he sneezes or coughs. (R. at 59). He estimated that he nearly falls two to three times a week, and actually falls two to three times each year. (*Id.*). His pain also affects his ability to sleep and his activities of daily living. He testified that he is typically "pretty restless through the night," and that he sleeps a couple of hours at a time. (R. at 58). He wakes up between 7 and 8 a.m., and takes an hour or two to get moving. (*Id.*). After that, he does "what [he] can, when [he] can, if [he] feel[s] up to it." (*Id.*). That might include reading or using the computer. (*Id.*). He estimated that he uses a computer two to three hours each day. (R. at 75). On other days, when he is feeling depressed (he says his depression intensified as he began to feel hopeless about his chronic back pain) or is in pain, he spends most of his day "in bed without showering or even eating." (R. at 59). He lives on the second floor of his parents' two-story house, and testified that he spends most of his time upstairs because he

has a difficult time descending and climbing the stairs. (R. at 68-69). Although he attempts to do many of his own chores, his parents often must help him. (*See* R. at 69, 82). For example, his mother helps him with his laundry by carrying his laundry basket downstairs, as he is prone to losing his balance and lifting something that weighs more than a gallon of milk causes him pain. (R. at 70, 72). He doesn't drive, (R. at 65), and said he leaves his house once or twice a week. (R. at 70-71). He leaves to "grab . . . a few things from the store, grab some medication, grab a couple things for lunches, . . . go out for a family dinner, or . . . visit [his] grandmother." (R. at 71). He does not date, but established a long-term friendship over the internet with a woman who would occasionally visit him. (R. at 73).

The ALJ asked the vocational expert to assume an individual of Plaintiff's age, education, and work history, who could perform light work "with only occasional climbing ramps and stairs, balancing, stooping, and operating foot controls with the left lower extremity; frequent kneeling, crouching, crawling; no climbing latters, ropes or scaffolding; no work involving hazards such as dangerous machinery and unprotected heights. . . ." (R. at 90). The vocational expert testified that an individual with such restrictions could work as a cafeteria attendant, vending machine attendant, housekeeper, cashier, ticket checker, charge account clerk, or telephone quotation clerk. (R. at 91-92). Moreover, the vocational expert concluded that a person could do all of these jobs even if "primarily because of side effects of medication, there might be lapses in concentration, persistence or pace when attempting complex or detailed tasks." (R. at 93).

### III.    The ALJ's Decision

In her decision, the ALJ applied the familiar five-step sequential evaluation process and found that Plaintiff is not disabled under the Act. (R. at 19-31). Relevant to this opinion, the ALJ found that Plaintiff has not engaged in substantial gainful activity since April 25, 2009. (R. at 21). At Step Two, she found that Plaintiff suffers from a variety of severe impairments, including a status post burst fracture at T12 with resultant myelomalacia, degenerative disc disease of the cervical spine and the lumbar spine, and right wrist deformity. (*Id.*). However, at Step Three, the ALJ concluded that none of Plaintiff's impairments or combination of impairments meets or equals the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 24).

At Steps Four and Five, the ALJ found that Plaintiff does not have the residual functional capacity to perform past work, but can perform light work as defined in 20 C.F.R. § 404.1567(b), subject to certain additional limitations. (R. at 24-30). Considering Plaintiff's age, education work experience, and residual functional capacity, the ALJ found that jobs exist in the national economy that Plaintiff can perform. (R. at 29-30). In assessing Plaintiff's residual functional capacity, the ALJ discredited Plaintiff's and his father's statements regarding Plaintiff's functional capacity. (R. at 25-26). She concluded that Plaintiff's activities of daily living are inconsistent with his alleged lack of functional capacity, that his medication has been effective in controlling his symptoms, and that the significant gaps in his medical history detract from his credibility. (*Id.*). Moreover, she concluded that the objective medical evidence and diagnostic findings – namely the

findings that his back abnormalities were "almost exclusively assessed as 'mild'" – suggest a greater functional capacity than Plaintiff has acknowledged. (R. at 27-28).

LEGAL STANDARDS

## I. Disability Standard

To be entitled to disability benefits under the Social Security Act, a claimant must prove he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). The Commissioner must make factual determinations in assessing the claimant's ability to engage in substantial gainful activity. *See* 42 U.S.C. § 405(b)(1). The Commissioner applies a five-step sequential analysis to determine whether the claimant is entitled to benefits. 20 C.F.R. § 404.1520; *see also Maggard v. Apfel*, 167 F.3d 376, 378 (7th Cir. 1999). The claimant has the burden to prove disability through step four of the analysis, i.e., he must demonstrate an impairment that is of sufficient severity to preclude him from pursuing his past work. *McNeil v. Califano*, 614 F.2d 142, 145 (7th Cir. 1980).

In the first step, a threshold determination is made as to whether the claimant is presently involved in a substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is not under such employment, the Commissioner of Social Security proceeds to the next step. *Id.* At the second step, the Commissioner evaluates the severity and duration of the impairment. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant has an impairment that significantly limits his physical or mental ability to do basic work activities, the Commissioner will proceed to the next step. 20 C.F.R. § 404.1520(c). If the claimant's impairments, considered

in combination, are not severe, he is not disabled and the inquiry ends. *Id.* At the third step, the Commissioner compares the claimant's impairments to a list of impairments considered severe enough to preclude any gainful work; if the elements of one of the Listings are met or equaled, the claimant is eligible for benefits. 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. Part 404, Subpt. P, App. 1.

If the claimant does not qualify under one of the listed impairments, the Commissioner proceeds to the fourth and fifth steps, after making a finding as to the claimant's residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(e). At the fourth step, the claimant's RFC is evaluated to determine whether he can pursue his past work. 20 C.F.R. § 404.1520(a)(4)(iv). If he cannot, then, at step five, the Commissioner evaluates the claimant's ability to perform other work available in the economy, again using his RFC. 20 C.F.R. § 404.1520(a)(4)(v).

## II. Standard of Review

When a claimant seeks judicial review of an ALJ's decision to deny benefits, the Court must "determine whether it was supported by substantial evidence or is the result of an error of law." *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). The Court's review is governed by 42 U.S.C. § 405(g), which provides, in relevant part: "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is "'such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Maggard*, 167 F.3d at 379 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

In a substantial evidence determination, the Court will review the entire administrative record, but it will "not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). In particular, credibility determinations by the ALJ are not upset "so long as they find some support in the record and are not patently wrong." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994). The Court must ensure that the ALJ "build[s] an accurate and logical bridge from the evidence to his conclusion," but he need not have addressed every piece of evidence. *Clifford*, 227 F.3d at 872. Where the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## DISCUSSION

Plaintiff has identified four grounds on which he is challenging the ALJ's decision. First, he argues that the ALJ erred at Step Three when she concluded that he has not met or equaled Listing 1.04A. (Doc. 12 at 7-9). Second, he argues that the ALJ erred in assessing his credibility. (*Id.* at 9-10). Third, he argues that the ALJ failed to develop a logical bridge between the MRI and lay opinion evidence to her conclusion that he was not disabled. (*Id.* at 10-11). Finally, he argues that the ALJ erred in her assessment of his residual functional capacity. (*Id.* at 11-12). As discussed more fully below, the ALJ erred at Step Three by failing to provide anything beyond a perfunctory analysis of whether Plaintiff meets or equals the applicable listing. This failure alone warrants a remand. On remand, should an ALJ find that Plaintiff has not met or equaled Listing 1.04A, she must revisit her

assessment of Plaintiff's residual functional capacity in light of other concerns raised below.

### I.  The ALJ's Step 3 Determination

Plaintiff's first argument is that the ALJ erred when she failed to find that the combination of his T12 burst fracture, spinal canal stenosis, lumbar radiculopathy, degenerative disc disease, and myelomalacia met or equaled Listing 1.04. (Doc. 12 at 7).   He suggests that evidence on the record conclusively shows that this combination of spinal disorders and the associated symptoms meets or equals the criteria of Listing 1.04A, and urges the Court to reverse the ALJ's decision and find that he is presumptively disabled.   Because the ALJ's perfunctory analysis at Step 3 does not provide a logical bridge from the evidence to her conclusion, remand is necessary.

A social security claimant is presumptively disabled if he has an impairment that meets or equals an impairment found in the Listing of Impairments. 20 C.F.R. § 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1. Each listing specifies the relevant criteria necessary to meet it. *See* 20 C.F.R. § 404.1525(a). In order to meet or equal a listed impairment, a claimant must satisfy all of its criteria. *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006).

In this case, Plaintiff alleges that he satisfies Listing 1.04A. Listing 1.04 describes spinal disorders that result in compromise of a nerve root or the spinal cord, with evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04. Claimants seeking to satisfy Listing 1.04 may do so in one of three ways,

delineated in the listing as 1.04A, 1.04B, and 1.04C. *See id.* Listing 1.04A requires: "Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." *See id.*

At Step 3, an ALJ "must discuss the listing by name and offer more than perfunctory analysis of the listing." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). Here, the ALJ's discussion at Step 3 was a terse three sentences. She wrote,

> In reaching this conclusion, the undersigned considered listing 1.04 governing disorders of the spine. The medical evidence of record does not document any spinal abnormalities necessary to meet the requirements of Section 1.04 of the Listings, governing disorders of the spine. There is no evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss and positive straight-leg raising test; spinal arachnoiditis; or lumbar spinal stenosis resulting in pseudoclaudication with inability to ambulate effectively, as required by section 1.04.

(R. at 24). This is exactly the sort of analysis that courts have found is so perfunctory as to require remand. *See Minnick v. Colvin*, 775 F.3d 929, 935-36 (7th Cir. 2015) (remanding because of perfunctory analysis at Step 3, when ALJ simply concluded, "The evidence does not establish the presence of nerve root compression, spinal arachnoiditis, or spinal stenosis resulting in pseudoclaudication, as required by the listing."); *Canata v. Astrue*, No. 09 C 5649, 2011 WL 6780923, at *3 (N.D. Ill. Dec. 23, 2011) (expressing skepticism that "so terse an explanation for a Step 3 finding" as "there is no objective evidence of spinal arachnoiditis, spinal stenosis, osteoarthritis or degenerative disc disease resulting in compromise of a nerve root

or the spinal cord," could ever "satisfy the minimal articulation standard necessary to support an ALJ's findings.").

The ALJ's analysis is especially problematic because she failed "to acknowledge several aspects of the record that could in fact meet or equal Listing 1.04." *See Minnick*, 775 F.3d at 936. Here, where the ALJ simply concluded that there is *no* evidence that could establish presumptive disability, the Court cannot discern whether the ALJ "considered and dismissed, or completely failed to consider this pertinent evidence." *Id. See also Canata*, 2011 WL 6780926, at *7 (explaining that an ALJ's analysis is perfunctory when she "does not evaluate any of the evidence favorable to the claimant at Step 3 that relates to the required criteria of a listed impairment."); *Turner v. Colvin*, No. 12-cv-10229, 2014 WL 3610887, at *7 (N.D. Ill. July 22, 2014) (explaining that a "conclusory statement that a severe impairment does not meet or equal a listing cannot substitute for a meaningful discussion of all the relevant medical evidence.").

Again, under Listing 1.04A, Plaintiff has the burden of presenting evidence that he suffers from a disorder of the spine resulting in compromise of a nerve root or the spinal cord, and evidence of nerve root compression that is characterized by (a) neuro-anatomic distribution of pain, (b) limitation of motion of the spine, (c) motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss, and (d) if there is involvement of the lower back, positive straight-leg raising test (sitting and supine). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A.

There is evidence on the record that Plaintiff "at least arguably exhibited the requisite symptoms." *See Benford v. Astrue*, No. 11 C 4, 2011 WL 4396921, at *4 (N.D. Ill. Sept. 20, 2011).

First, Plaintiff has presented evidence from Dr. Taiwo that he suffers from lumbar radiculopathy in addition to myelomalacia. (R. at 285). This diagnosis provides at least some evidence of nerve root compression. *See Schomas v. Colvin*, 732 F.3d 702, 704 (7th Cir. 2013) (citing Dorland's Illustrated Medical Dictionary 1571 (32nd ed. 2012)) ("Lumbar radiculopathy is a painful condition of the nerve roots in the lower spine, often caused by disc herniation or compression."); *Brinkley v. Astrue*, No. 1:10-CV-263, 2012 WL 1035443, at *3, n.3 (N.D. Ind. Mar. 27, 2012) (citing *Spine Interest Group*, Mayo Clinic, http://www.mayclinic.org/neurology/spinegroup.html) ("Lumbar radiculopathy is chronic pain which occurs in the lower back and legs and is caused by compressed nerve roots in the spine.").

Second, Plaintiff has also presented evidence of neuro-anatomic distribution of pain, as the record contains consistent complaints of pain in his lower back that radiates into his left leg. (*See, e.g.,* R. at 282, 284; 298-304).

Third, Dr. Taiwo concluded that "[t]he range of motion of the lumbar spine was limited." (R. at 284).

Fourth, Plaintiff has presented some evidence of motor loss accompanied by sensory or reflex loss. Dr. Taiwo observed that Plaintiff was only able to "perform a toe/heel walk with difficulty on the left leg." (*Id.*). The "[i]nability to walk on the heels or toes, to squat, or to arise from a squatting position, when appropriate, may

be considered evidence of significant motor loss." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(E)(1). This evidence of motor loss, accompanied with medical evidence that Plaintiff lacked strength in his left leg and reports of intermittent numbness (particularly when sneezing) could meet Listing 1.04A. *See Kastner v. Astrue*, 697 F.3d 642, 650 (7th Cir. 2012) (holding that an ALJ erred in concluding that the claimant did not meet 1.04A after perfunctory analysis that failed to acknowledge evidence that the claimant could not tandem walk or squat and had reduced muscle strength); *Turner*, 2014 WL 3610887, at *7 (finding that evidence that claimant had difficulty walking on her heels and toes, had intermittent numbness in her feet and toes, and had decreased sensation in her lower left extremity could provide evidence sufficient to meet Listing 1.04A).

Finally, Dr. Taiwo also observed that Plaintiff had a positive strait leg raise test while supine and seated. (R. at 284).

Rather than addressing this evidence, Defendant argues that Plaintiff could not possibly meet Listing 1.04A because there is no evidence in the record that Plaintiff could not ambulate effectively. (*See* Doc. 16 at 5-6). However, Listing 1.04A does not require evidence of inability to ambulate effectively. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04. That requirement is found in Listing 1.04C, which requires, "Lumbar spinal stenosis resulting in pseudoclaudication . . .resulting in inability to ambulate effectively, as defined in 1.00B2b." *Id.* Therefore, Defendant's argument is beside the point. *See Humphrey v. Astrue*, No. 1:09-CV-1261, 2011 WL 221870, at *3 (S.D. Ind. Jan. 21, 2011) (noting that "the ability to ambulate effectively is not a requirement of Listing 1.04A).

The Court does not wish to give the misimpression that this evidence conclusively establishes that Plaintiff is presumptively disabled under Listing 1.04A. Indeed, on remand an ALJ very well could conclude that Plaintiff has not met the requirements of the Listing and has similarly not presented evidence that equals the Listing. For example, Plaintiff told the ALJ that the myelomalacia – which affects the spinal cord and does not relate to the nerve roots – is "what's affecting [his] tingling sensations, [his] numbness, [his] brief burst of being paralyzed in [his] left leg while sneezing and coughing and doing activities like that." (R. at 62-63). Aside from Dr. Taiwo's conclusion that Plaintiff suffers from lumbar radiculopathy and Plaintiff's observed symptoms and limitations, the Court did not identify other evidence – including objective medical evidence like MRIs – tending to show impingement of the nerve root. It is up to an ALJ to conduct this analysis on remand, and do so in a way that assures the Court that she considered all relevant evidence.

## II. The ALJ's RFC Determination

Having determined that the ALJ erred at Step 3, it is unnecessary for the Court to proceed further and consider additional arguments regarding ALJ error at subsequent steps. *See Kastner*, 697 F.3d at 646, n.1 (explaining that a finding of error at Step 3 obviates the need to consider arguments made by parties at subsequent steps). However, should the ALJ conclude that Plaintiff is not presumptively disabled at Step 3, the Court wishes to identify certain additional errors that the ALJ made in determining Plaintiff's residual functional capacity that should be corrected on remand, if necessary.

First, as part of her credibility determination, the ALJ drew an inappropriate adverse inference based upon Plaintiff's relatively thin history of medical treatment. She noted that the record reflected "significant gaps in the claimant's history of treatment," and said Plaintiff's allegations of disabling back pain "would be more persuasive if he had pursued significant treatment for his allegedly disabling pain in the two years between the year of his alleged onset date (2009) and the year of his disability hearing (2012)." (R. at 26-27).

An ALJ may rely upon infrequent treatment in order to support an adverse credibility decision; however, she may not draw any inferences from infrequent treatment until she "has explored the claimant's explanations as to the lack of medical care." *Moss v. Astrue*, 555 F3d 556, 562 (7th Cir. 2009)(internal quotation marks omitted). This is because there may be explanations for a failure to seek treatment that "provide insight into [a claimant's] credibility," such as an inability to pay for treatment or access low-cost treatment. *See* SSR 96-7p, 1996 WL 374186, at *7-8 (July 2, 1996); *see also Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009). Here, the ALJ erred by negatively assessing Plaintiff's credibility based on his lack of treatment without inquiring into any reasons why he might not have sought more regular treatment. *See Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008).

The ALJ also discounted Plaintiff's credibility and determined his residual functional capacity based on the fact that his medical records "were almost exclusively assessed as 'mild' throughout the period under consideration." (R. at 28). Although objective medical evidence did lead to a number of diagnostic findings described as "mild," other objective medical evidence suggests that Plaintiff's

medical issues were more substantial. For example, the ALJ points to the "mild loss of disk height" in Plaintiff's cervical spine, but ignores the fact that Plaintiff's loss of disc height in the thoracic spine between 2009 and 2012 was substantial. (*See* R. at 28, 333). In assessing evidence, the ALJ is under no obligation to "mention every snippet of evidence on the record." *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012). However, she "may not ignore entire lines of contrary evidence." *Id.* It appears, however, that the ALJ did just that.

Generally, courts "will not upset credibility determinations on appeal so long as they find some support in the record and are not patently wrong." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994). "To evaluate credibility, an ALJ must 'consider the entire case record and give specific reasons for the weight given to the individual's statements.' SSR 96–7p. In other words, the ALJ should look to a number of factors to determine credibility, such as the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received and medication taken, and 'functional limitations.'" *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009).

Defendant argues that the ALJ "gave several reasons for finding Plaintiff's subjective complaints and his father's testimony not credible," including Plaintiff's reports that his treatment was effective, Plaintiff's gaps in treatment history, Plaintiff's activities of daily living, and the objective and clinical evidence regarding Plaintiff's impairments. (Doc. 16 at 7-9). Certain of these reasons are supported by the record, but as discussed above others are either not supported, ignore contrary evidence, or are based on impermissible assumptions. The ALJ did not explain in

her opinion the relative weight she assigned to each of the reasons that contributed to her decision to find the Plaintiff not credible. Therefore, in spite of the reasons that the ALJ gave for discounting Plaintiff's credibility which are supported by the record, the Court cannot simply assume the ALJ would have reached the same conclusion regarding Plaintiff's credibility had she not made the errors discussed above. *See Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)) (requiring that the ALJ "sufficiently articulate [her] assessment of the evidence to 'assure us that [she] considered the important evidence . . . and to enable us to trace the path of [her] reasoning.'"). Therefore, should an ALJ determine that Plaintiff is not disabled at Step 3, she should reconsider Plaintiff's residual functional capacity in light of the concerns raised here.

## CONCLUSION

Because the ALJ failed to properly analyze whether Plaintiff's impairments met or equaled a listing at Step 3, the decision must be remanded to the Social Security Administration for further proceedings. On remand, the ALJ should, if necessary, address the other deficiencies identified by the Court.

IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment (Doc. 11) is GRANTED IN PART and DENIED IN PART and that Defendant's Motion for Summary Affirmance (Doc. 15) is DENIED. The Court VACATES the decision denying benefits and REMANDS this matter back to the Commissioner for further proceedings pursuant to 42 U.S.C. § 405(g) (sentence four). IT IS SO ORDERED.

CASE TERMINATED.

Entered this 10th day of July, 2015.

s/Joe B. McDade
JOE BILLY McDADE
United States Senior District Judge
